FILED by [signature] D.C.
APR 26 2012
STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-20285 CR-SEITZ**
**MAGISTRATE JUDGE SIMONTON**
**18 U.S.C. § 1349**
**18 U.S.C. § 982**

**UNITED STATES OF AMERICA**

**vs.**

**ALBA SERRANO,**

**Defendant.**
______________________________/

**INFORMATION**

The United States Attorney charges that:

**CONSPIRACY TO COMMIT HEALTH CARE FRAUD**
**(18 U.S.C. § 1349)**

**General Allegations**

At all times relevant to this Information,

1. The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were over the age of sixty-five or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries." Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

2. Part B of Medicare covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness. The treatment plan of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care and was designed, in part, to reduce medical costs by treating qualifying individuals outside the hospital setting.

3. Medicare generally required that the PHP be provided at a facility that was hospital-based or hospital-affiliated, but Medicare also allowed a PHP to be provided in a Community Mental Health Center ("CMHC"), which was a provider type under Part A of Medicare.

4. Medicare required that, to qualify for the PHP benefit, the services must have been reasonable and necessary for the diagnosis and active treatment of the individual's condition. The program also must have been reasonably expected to improve or maintain the condition and functional level of the patient and to prevent relapse or hospitalization. The program must have been prescribed by a physician, furnished under the general supervision of a physician, and delivered under an established plan of treatment that meets Medicare requirements.

5. Typically, a patient who needed this intensive PHP treatment had a long history of mental illness that had been treated. Patients were ordinarily referred either (a) by a hospital after full inpatient hospitalization for severe mental illness or (b) by a doctor who was trying to prevent full inpatient hospitalization for a severely mentally ill patient the doctor had been treating.

6. Medicare did not cover programs involving primarily social, recreational, or diversionary activities.

7. In order to receive payment from Medicare, a CMHC, medical clinic, or physician was required to submit a health insurance claim form to Medicare, called a Form 1450. The claims

could be submitted in hard copy or electronically. A CMHC, medical clinic, and physician may contract with a billing company to transmit claims to Medicare on their behalf.

8. Medicare Part B was administered in Florida by First Coast Service Options, which, pursuant to contract with the United States Department of Health and Human Services, served as a contracted carrier to receive, adjudicate, and pay Medicare Part B claims submitted to it by Medicare beneficiaries, physicians, or CMHCs. Medicare Part B paid CMHCs and physicians directly for the cost of PHP services furnished to eligible Medicare beneficiaries, provided that the services met Medicare requirements.

9. An Assisted Living Facility ("ALF") meant any facility licensed by the Florida Agency for Health Care Administration, whether operated for profit or not, which provided housing, meals, and one or more personal services for a period exceeding 24 hours to one or more adults who were not relatives of the owner or administrator.

10. A Halfway House was a facility that supported the reintegration of persons who had been recently released from prison or jail, or assisted individuals who were recovering from various drug and alcohol addictions.

**The Defendant, Related Entities, and Related Parties**

11. Defendant **ALBA SERRANO**, a resident of Miami-Dade County, was the owner of an ALF called Elsa's House for the Elderly ("Elsa's House") which was located at 11700 S.W. 169th Terrace, Miami, Florida, in Miami-Dade County, and she was the president and registered agent of Elsa's Home, Inc., a Florida corporation with the same address.

12. American Therapeutic Corporation ("ATC") was a Florida corporation originally established in 2002 and was headquartered in Miami, Florida. ATC operated several purported

PHPs throughout Florida from Homestead to Orlando, including PHPs at the following addresses: 1801 N.E. 2nd Avenue, Miami, Florida 33132; 61 Grand Canal Drive, Suite #100, Miami, Florida 33144; 1001 West Commercial Blvd., Fort Lauderdale, Florida 33309; 4960 North Dixie Highway, Fort Lauderdale, Florida 33334; 27112 South Dixie Highway, Naranja, Florida 33032; 717 East Palmetto Park Road, Boca Raton, Florida 33432; and 4790 North Orange Blossom Trail, Orlando, Florida 32810.

13. Medlink Professional Management Group, Inc. ("Medlink") was a Florida corporation established in 2003 and was headquartered at 484 Brickell Avenue, Suite 1220, Miami, Florida 33132 and later at 1809 N.E. 2nd Avenue, Miami, Florida 33132.

14. Lawrence S. Duran ("Duran"), a resident of Miami-Dade County, was the manager and owner of ATC and Medlink.

15. Marianella Valera ("Valera"), a resident of Miami-Dade County, was the owner, CEO, president, secretary, and treasurer of ATC.

16. Judith Negron ("Negron"), a resident of Miami-Dade County, was the vice president and part owner of Medlink.

17. Margarita Acevedo, a/k/a Margarita De La Cruz ("Acevedo"), a resident of Miami-Dade County, was the Marketing Director of ATC. Acevedo supervised ATC's "marketers" who would pay and cause the payment of kickbacks to ALF and Halfway House owners and operators and patient recruiters – including **ALBA SERRANO** – in exchange for Medicare beneficiary "referrals" to ATC.

18. Joseph Valdes, a/k/a Joseph Valdez ("Valdes"), a resident of Broward County, was a marketer for ATC who would pay and cause the payment of kickbacks to ALF and Halfway House

owners and operators and patient recruiters – including **ALBA SERRANO** – in exchange for Medicare beneficiary "referrals" to ATC.

**The Conspiracy**

19. From on or about October 30, 2005, through on or about July 30, 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ALBA SERRANO,**

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the United States Attorney, including Duran, Valera, Negron, Acevedo, and Valdes, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

**Purpose of the Conspiracy**

20. It was a purpose of the conspiracy for **ALBA SERRANO** and her co-conspirators, known and unknown to the United States Attorney, to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare through ATC for services that were medically unnecessary, that were not eligible for Medicare reimbursement, and that were never provided; (b) offering and paying kickbacks and bribes to ALF and Halfway House owners and operators as well as patient recruiters who provided and had access

to ineligible Medicare beneficiaries to attend ATC's CMHCs; and (c) receiving kickbacks and bribes to ensure the attendance of these ineligible Medicare beneficiaries at ATC's CMHCs.

**Manner and Means**

The manner and means by which the defendant and her co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

21. Duran and Valera would own and operate ATC as a company registered in the State of Florida, concealing Duran's ownership interest.

22. Valera would maintain a Medicare provider number for five of ATC's locations in order to submit Medicare claims for PHP services at all of ATC's locations.

23. Duran and Negron would own and operate Medlink in the State of Florida.

24. **ALBA SERRANO,** along with other ALF and Halfway House owners and operators and patient recruiters, would solicit and receive kickback payments from Duran, Valera, Negron, Acevedo, Valdes, and others in return for referring Medicare beneficiaries, who did not qualify for PHP treatment, to ATC for purported PHP services.

25. Duran, Valera, Negron, Acevedo, Valdes, and others would pay and cause the payment of kickbacks to **ALBA SERRANO,** along with other ALF and Halfway House owners and operators and patient recruiters, in exchange for the delivery and causing the delivery of Medicare beneficiaries, who did not qualify for PHP treatment, to ATC for purported PHP services.

26. **ALBA SERRANO** would deliver and cause the delivery of Medicare beneficiaries, who did not qualify for PHP treatment, to ATC for purported PHP treatment based solely on their eligibility to receive benefits under Medicare.

27. Duran, Valera, and others would cause the fabrication and alteration of treatment notes for the purpose of making it falsely appear that the patients who were purportedly treated at ATC qualified for PHP services.

28. Duran, Valera, Negron, and others would cause the transfer and disbursement of illicit proceeds derived from the fraudulent billing scheme into and out of ATC's and Medlink's various corporate bank accounts to themselves and others, including kickback payments from Medlink to **ALBA SERRANO.**

29. Duran, Valera, Negron, Acevedo, Valdes, and others, including **ALBA SERRANO,** would cause false and fraudulent claims to be submitted to Medicare for services purportedly provided at ATC's locations.

All in violation of Title 18, United States Code, Section 1349.

**FORFEITURE**
**(18 U.S.C. § 982)**

1. The allegations contained in this Information are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which defendant **ALBA SERRANO** has an interest.

2. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction for the offense charged in this Information, **ALBA SERRANO** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. If any of the property described above, as a result of any act or omission of the defendant:

      a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures outlined in Title 21, United States Code, Section 853.

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

SAM S. SHELDON
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

STEVEN KIM
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA** **CASE NO.** ______________________

**vs.**

**ALBA SERRANO,**

**Defendant.**
______________________/

# CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

_X_ Miami ____ Key West
____ FTL ____ WPB ____ FTP

New Defendant(s) Yes ____ No ____
Number of New Defendants ____
Total number of counts ____

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) _Yes_
   List language and/or dialect _Spanish_

4. This case will take _0_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

(Check only one) (Check only one)

| | | | | |
|---|---|---|---|---|
| I | 0 to 5 days | X | Petty | |
| II | 6 to 10 days | | Minor | |
| III | 11 to 20 days | | Misdem. | |
| IV | 21 to 60 days | | Felony | X |
| V | 61 days and over | | | |

6. Has this case been previously filed in this District Court? (Yes or No) _No_
If yes:
Judge: ______________ Case No. ______________
(Attach copy of dispositive order)
Has a complaint been filed in this matter? (Yes or No) _No_
If yes:
Magistrate Case No. ______________
Related Miscellaneous numbers: ______________
Defendant(s) in federal custody as of ______________
Defendant(s) in state custody as of ______________
Rule 20 from the ______________ District of ______________

Is this a potential death penalty case? (Yes or No) _No_

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? ____ Yes _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? ____ Yes _X_ No

STEVEN KIM
DOJ TRIAL ATTORNEY
Court No. A5501162

*Penalty Sheet(s) attached

REV 4/8/08

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name:** Alba Serrano **Case No:** ______________________

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud

***Max Penalty**: 10 years' imprisonment

Count #: 2

______________________

______________________

***Max Penalty**: ______________________

Count #:

______________________

______________________

***Max Penalty:** ______________________

Count #:

______________________

______________________

***Max Penalty:** ______________________

***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NUMBER:** ____________________

**BOND RECOMMENDATION**

DEFENDANT: ALBA SERRANO

$100,000 PSB
(Surety) (Recognizance) (Corp. Surety) (Cash) (Jail)
(CSB) (No Bond) (Warrant) (Summons) (Marshal's Custody)

By: ____________________
**AUSA:** DOJ Atty Steven Kim

Last Known Address: ____________________

____________________

____________________

What Facility: ____________________

____________________

Agent(s): FBI S/A JOEL COX
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) (**OTHER**)